# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ESTHER NOLDON,        )
                                )
      Plaintiff,       )
                                )
   v.                   )    Case number 4:04cv1624 TCM
                                )
JO ANNE B. BARNHART,     )
Commissioner of Social Security,   )
                                )
      Defendant.     )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Esther Noldon's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b.  Ms. Noldon ("Plaintiff") has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Plaintiff applied for DIB and SSI in June 2002, alleging a disability since February 2002 caused by diabetes mellitus, swollen joints, depression, fatigue, and stomach cramps.

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).

(R. at 68-69A, 479-81.)[2]   Her applications were denied.   (Id. at 43-44, 46-50, 478.)
Subsequently, a hearing was held, at Plaintiff's request, in November 2003 before
Administrative Law Judge ("ALJ") James E. Seiler. (Id. at 20-41.) The ALJ determined that
Plaintiff was not under a disability at any time on or before the date of his decision, and
denied her applications. (Id. at 13-19.) The Appeals Council denied review of that decision,
effectively adopting the decision as the final decision of the Commissioner. (Id. at 4-6.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative
hearing.

Plaintiff testified she was born on January 11, 1965, and was then 38 years old. (Id.
at 23.) She completed the twelfth grade. (Id. at 24.) She has two children, one 11 years old
and one 10 years old. (Id. at 27.) Plaintiff is five feet seven inches tall and typically weighs
306 pounds. (Id. at 30.) She was on a low-fat, low-salt diet program to lose weight. (Id. at
30, 39.) She tries to exercise, but has to stop because of chest pain. (Id. at 39-40.)

Asked about her impairments, Plaintiff began by explaining that her depression and
anxiety began five to six years before with crying spells, confusion, needing to be alone, and
a loss of interest in things. (Id. at 24, 26.) The depression and anxiety became so severe at
the beginning of 2002 that she had to stop working. (Id. at 24.) When she had tried to work,
her concentration was so impaired that she felt her supervisor was imposing on her and she

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

would start crying for no reason.  (Id. at 26.)  If a co-worker asked her to redo something, she would start crying.  (Id.)  She sought medical treatment first from her primary doctor and than from a referred psychiatrist.  (Id. at 24-25.)  The psychiatrist diagnosed her with major depression and prescribed Prozac and Zoloft.  (Id. at 25.)  After that psychiatrist retired, Plaintiff began seeing, and was currently seeing, a Dr. Sumer.  (Id.)  Dr. Sumer had prescribed Prozac, Lorazepam, and Topomax for her.  (Id.)  The Lorazepam was for anxiety and the Topomax was an appetite suppression.  (Id.)  All three caused drowsiness.  (Id.)  Her depression began when her husband died.  (Id. at 28.)

Plaintiff further testified that she could not handle any work stress.  (Id. at 27.)  She gets nervous around people and cries.  (Id.)  Asked how often she experienced problems with anxiety, Plaintiff replied, "Too often."  (Id.)  She had an anxiety attack at least once a day.  (Id.)

Her niece helps her.  (Id.)  She calls everyday and will come over and help.  (Id.)  Plaintiff's children also help.  (Id.)

In 1991, Plaintiff was diagnosed with diabetes.  (Id.)  She is on insulin and takes an oral medication.  (Id.)  She usually sees a doctor once a month for her diabetes, but had recently been seeing the doctor every three weeks because of the sores that were developing on her legs and feet.  (Id. at 29.)  One of her diabetes medications causes diarrhea.  (Id.)  The diabetes causes stomach cramps, blurred vision, and numb fingers and toes.  (Id. at 29-30.)  A lack of circulation in her legs makes it painful for her to walk.  (Id. at 30.)

In 2003, Plaintiff was diagnosed with sleep apnea.  (<u>Id.</u>)  She uses a "CPAP" machine at night; however, it is hard for her to sleep with it.  (<u>Id.</u>)

Plaintiff also suffered from headaches.  (<u>Id.</u> at 31.)  Her doctor had prescribed hydrocodone; however, the medication made her sleepy.  (<u>Id.</u>)  She took it once a day as needed. (<u>Id.</u>)  She took an anti-inflammatory medication for her arthritis.  (<u>Id.</u> at 31-32.)  The arthritis made it painful for her to grip anything and caused swelling in her hands, feet, and ankles.  (<u>Id.</u> at 32.)  She has had chest pains in the past.  (<u>Id.</u>)  She had gone to the emergency room in August 2003 with chest pains and had been told that she had a fluid build-up in her chest.  (<u>Id.</u> at 33.)  The emergency room doctors had told her the chest pains might be caused by her Atkin's diet.  (<u>Id.</u>)

During the day, after her children left for school, Plaintiff alternated between doing household chores and sitting down and dozing off.  (<u>Id.</u> at 34.)  After her children arrived home, she helped them with their homework.  (<u>Id.</u> at 35.)  If they had after-school activities, her niece came and took them.  (<u>Id.</u>)  She goes to bed around 9:00 or 10:00 in the evening. (<u>Id.</u>)

Plaintiff only left her house to go to the doctor or on a similar errand.  (<u>Id.</u>)  She could drive, although that became a problem if she was tired or did not feel comfortable driving by herself.  (<u>Id.</u>)  She tries to see her mother, who is in a nursing home, every day.  (<u>Id.</u> at 39.)

Asked if she could return to her former office job, Plaintiff stated that she could not. (<u>Id.</u> at 36.)  At a former factory job, Plaintiff had had to stand eight hours and lift a maximum of fifty pounds.  (<u>Id.</u> at 37.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and medical evaluation reports.

On a pain questionnaire, Plaintiff described her pain as occurring everyday. (<u>Id.</u> at 106.) She did not know what caused the pain; it usually began when she was sitting down. (<u>Id.</u>) Since 1986, she has had pain that limited her abilities. (<u>Id.</u>) It sometimes is so bad that she is afraid to move. (<u>Id.</u>) To relieve the pain, she either takes medication or goes to an emergency room. (<u>Id.</u>) In a claimant questionnaire, Plaintiff explained that the pain was usually too sharp to do anything but wait for it to let up. (<u>Id.</u> at 107.) It gets worse when she moves. (<u>Id.</u>) She had just started taking a medication that made her sleepy all the time. (<u>Id.</u>) Her niece sometimes has to help her finish her shopping, prepare meals, and complete her chores, e.g., the laundry or cleaning. (<u>Id.</u> at 108-09.) Her children sometimes help also. (<u>Id.</u> at 109.) She walks for exercise when she is able. (<u>Id.</u>) Sometimes she has to read something twice to remember it. (<u>Id.</u>) If she goes out, e.g., to the park or a show, she feels overwhelmed if she is gone for longer than two hours. (<u>Id.</u>)

Plaintiff's niece, Erica Whitfield, completed the Daily Activities Questionnaire for her. (<u>Id.</u> at 121.) Ms. Whitfield reported that Plaintiff had frequent mood changes. (<u>Id.</u>) She also had crying spells and would forget where she put things. (<u>Id.</u>)

On a "Work History Report," Plaintiff listed five job titles. (<u>Id.</u> at 113.) The most recent were clerical, payroll clerk, and data entry. (<u>Id.</u>) She held none of these jobs for

longer than one year. (Id.) The clerical job required that she walk for one hour total during the day and sit for seven hours. (Id. at 114.) The heaviest weight she frequently lifted was ten pounds. (Id.) Her job as a payroll clerk required more walking, i.e., two hours, less sitting, i.e., six hours, ten minutes standing, five minutes handling big objects, and five minutes reaching. (Id. at 115.) The data entry job had the same exertional requirements as did the clerical job. (Id. at 116.)

An earnings report generated for Plaintiff listed income in all but two of the twenty years included, and one of those years was 2003. (Id. at 83.) In only three years did her annual earnings exceed $10,000.00. (Id.) The highest of these annual earnings was $16,893.57, in 2001. (Id.) A computer-generated employment history included 21 different employers for the 18 years in which she earned income. (Id. at 85-90.)

Plaintiff consulted Milton Levin, D.O., between 1993 and 1997, inclusive. (Id. at 368-74.) She first consulted him for her headaches in September 1993. (Id. at 374.) A few weeks later, she complained to him of gastritis after eating certain foods. (Id.) She continued to consult him in 1994 and 1995 about birth control and her diabetes. (Id. at 372-73.) In February 1995, Dr. Levin noted that her headaches were less frequent and that Plaintiff was going to watch her diet more closely. (Id. at 372.) In July, however, her headaches were described as "pounding." (Id. at 371.) In April 1996, following a period of routine consultations, Plaintiff reported that she had been having headaches for the past several weeks and had been nervous and upset at work. (Id. at 370.) In February 1997, Plaintiff reported feeling dizzy. (Id. at 368.) She had not been taking her diabetes

medications because she could not afford them. (Id.) During this period, her glucose levels were consistently high. (Id. at 378-92.)

In December 1997, Plaintiff consulted a nutritionist at St. Joseph's Health Center ("SJHC") pursuant to Dr. Levin's directions. (Id. at 333.) Plaintiff weighed 292 pounds; her goal weight was 150 pounds. (Id.) The nutritionist noted that Plaintiff reported that she had bacon, eggs, and toast for breakfast; a sandwich and chips for lunch; a large evening meal; an after-dinner snack; and a snack at 2 o'clock in the morning. (Id.) She also noted that Plaintiff reported that she had been walking for 20 to 30 minutes each day. (Id.) Plaintiff was instructed on a 1,500 calorie diabetic diet. (Id.)

In January 1998, Plaintiff went to the emergency room at SJHC with complaints of a chest pain lasting 20 to 30 minutes, shortness of breath, and a headache all day. (Id. at 311-32.) Her history included diabetes, hypertension, arthritis, chest pain, and headaches. (Id. at 311.) It was noted that Plaintiff had been in the emergency room before with complaints of chest pain but had had no follow-up testing after discharge. (Id. at 316.) Plaintiff was treated with medication. (Id. at 317.) A chest x-ray was normal; an electrocardiogram showed mild sinus tachycardia and was otherwise unremarkable. (Id. at 317, 319, 321-22.) Three hours after arrival, her chest pain and shortness of breath had resolved. (Id. at 314.) Plaintiff was discharged with instructions to follow up with her physician and to take Tylenol as needed for headache. (Id. at 317.)

Plaintiff's medical records are primarily from BJC Health Center ("BJC"). Those records begin in April 1999 when Plaintiff consulted a BJC health care provider about her

difficulty sleeping.  (Id. at 127.)  Her husband had recently died, and her resulting depression was thought to be the cause of her sleeplessness.  (Id.)  She was referred to a counselor and was given a starter pack of Zoloft.  (Id.)  She was additionally prescribed Naprosan for her joint pain.  (Id.)  It was also noted at that visit that her diabetes was uncontrolled.  (Id.)  She was to begin a new medication, was to continue taking insulin, and was to have regular meals.  (Id.)  A notation of a telephone consultation the next month indicates that Plaintiff was released to return to work that day.  (Id. at 129.)

At a well-woman visit in December, Plaintiff reported that her blood sugar was elevated and that she was not following her diet.  (Id. at 134.)  She had occasional headaches and stomach aches.  (Id.)  She was given another prescription for Zoloft.  (Id.)  One week later, Plaintiff telephoned to complain that the Zoloft was making her tired.  (Id. at 136.)  She was told to discontinue the Zoloft, eat breakfast, and consult a nutritionist about a low-fat diet.  (Id.)  She picked up such a diet the next day.  (Id.)

The next month, on January 14, 2000, Plaintiff consulted a nurse practitioner at BJC about her depression and diabetes.  (Id. at 136.)  She was trying to follow the diet.  (Id.)  Prevacid was helping with her abdominal pain, and she was seeing a counselor.  (Id.)  She was feeling overwhelmed by being a single mother and with helping her disabled mother.  (Id.)  She had an appointment with a nutritionist the next day.  (Id.)  The nurse practitioner called the counselor a few days later and noted that the counselor thought an anti-depressant, Alexa, might be helpful to Plaintiff.  (Id.)

A few months later, in April, Plaintiff telephoned to request that a prescription renewal be telephoned in to her pharmacy. (Id. at 142.) Her request was declined because she had not kept her last two appointments and needed to be seen. (Id.) Consequently, she consulted a BJC doctor, Zinnat Meghjee, D.O., on April 28 about stomach pain, nausea, and epigastric discomfort. (Id. at 143.) She had not been taking her insulin until recently because her insurance had run out. (Id.) She was given samples of Prevacid, Glucotrol, and some other medications and told to follow up in two or three weeks. (Id.)

Plaintiff did follow up with Dr. Meghjee. (Id. at 145.) She continued to complain about stomach pain. (Id.) She reported feeling under stress because she had had to admit her mother to a nursing home. (Id.) She also reported that Celexa had helped with her depression. (Id.) She was scheduled for an abdominal scan and was informed about diet. (Id.) She then weighed 283 pounds. (Id.) She was given samples of Celexa and Prevacid. (Id.)

In July 2000, Dr. Meghjee reported that Plaintiff was doing well. (Id. at 150.) She had not had any abdominal pain, fever, or chills. (Id.) She was trying to follow her diet, however, her blood sugar count remained high. (Id.) The next month, Plaintiff reported feeling more tired and forgetful. (Id. at 154.) Thinking that the Celexa was the cause, she had stopped taking it but was not feeling any better. (Id.) She had not been sleeping well and had been snoring a lot. (Id.) She lacked motivation. (Id.) Dr. Meghjee scheduled her for sleep studies, started her on Serzone for depression, and noted that her diabetes was not well controlled. (Id.) In September, Plaintiff stated that she was feeling much better. (Id.

at 156.)  She was able to concentrate at work better than before and her crying spells were a lot fewer.  (Id.)  She had joined a gym and had started exercising the day of her appointment.  (Id.)  Her hypertension was well controlled.  (Id.)  Her blood sugar levels were still in the high range and she was still tired.  (Id.)  She was advised to continue the Serzone.  (Id.)  On November 8, Plaintiff telephoned with a complaint that the Serzone was not helping.  (Id. at 161.)  She had started a new job, had increased stress, and was forgetful.  (Id.)  She had initially had a good response to the Serzone, so the dosage was increased.  (Id.)  On December 22, her depression was described as being under better control with the Serzone.  (Id. at 163.)  Her blood sugar levels remained high.  (Id.)

At a February 2001 visit to Dr. Meghjee, she was described as having a "history" of depression.  (Id. at 169.)  Two months later, however, her depression was described as getting worse.  (Id. at 170.)  The company she had been working for, Manpower, was relocating out of state.  (Id.)  She could not move because her mother was in a nursing home.  (Id.)  Also, there had been a death in the family and it was the anniversary of her husband's death.  (Id.)  She had been taking her antidepressants and her other medications.  (Id.)  She was to continue on the Serzone and was given a prescription for Xanax.  (Id.)  She was also given a prescription for headaches and a referral to a psychiatrist.  (Id.)  A few weeks later, Plaintiff had begun another job.  (Id. at 173.)

She next saw Dr. Meghjee in November 2001.  (Id. at 179.)  She was feeling better.  (Id.)  She had started on a diet and was planning on starting an exercise program.  (Id.)  Her blood sugar levels were high, but she did not have any chest pain or shortness of breath.  (Id.)

Dr. Meghjee reported that Plaintiff had a history of non-compliance. (Id.) The next month, Plaintiff informed Dr. Meghjee that she had been depressed because a friend had stolen her car. (Id. at 183.) The week before her psychiatrist had started her on Trazodone and she was beginning to feel better. (Id.)

In January 2002, Plaintiff complained to Dr. Meghjee of bloating and right upper quadrant pain for the past few weeks. (Id. at 185.) She had been following her diet and had tried to exercise, but had not been successful. (Id.) Dr. Meghjee opined that the epigastric and right upper quadrant pain was probably caused by gastritis and prescribed Zantac. He again stressed the importance of diet. (Id.) Plaintiff had gained four pounds since her last visit. (Id.) Plaintiff continued to have right upper quadrant pain and was instructed at her next visit, on February 12, to increase her dosage of Prevacid. (Id. at 191.) She was also to be scheduled for a computerized topography ("CT") scan of her abdomen. (Id.) Two days later, she had an abdominal and pelvic CT scan. (Id. at 226.) The results were negative. (Id.) She reported these results to Dr. Meghjee on February 18. (Id. at 193.) The epigastric and right upper quadrant pain were still present and the nauseousness was worse, especially after eating and on an empty stomach. (Id.) She was advised to discontinue the Prevacid and was prescribed a different medication, Protonix. (Id.) If that medication did not resolve her pain, an endoscopy would be performed. (Id.)

In April, Plaintiff consulted a gastroenterologist on referral from Dr. Meghjee. (Id. at 459-60.) She reported upper abdominal pain after eating fatty or spicy food or taking Motrin. (Id. at 459.) She had a history of anemia. (Id. at 460.)

Plaintiff went to the emergency room at SJHC the night of May 22 with complaints of chest pain since that afternoon. (Id. at 240.) An x-ray showed no acute disease. (Id. at 246.) The heart was within normal limits; her lungs were not congested. (Id.)

Blood tests on May 29 indicated that her diabetes was out of control. (Id. at 204.) The next day, she had a stress test. (Id. at 224.) The test had be stopped after seven minutes because of chest pain. (Id.) There were no diagnostic EKG changes. (Id.) The exercise-induced chest discomfort was not suggestive of angina. (Id.)

At Plaintiff's next visit to Dr. Meghjee, on July 1, she reported that she had been following het diet and was exercising three times a week. (Id. at 208.) Her blood sugar levels were still high; she did not bring in her blood sugar results from home readings. (Id.) Her depression was improving; her dosage of Celexa had been recently increased. (Id.) She was not on a CPAP (continuous positive airway pressure) machine, and never had been. (Id.) She had had an upper endoscopy at St. Louis University and had been told everything was normal. (Id.) The endoscopy had been performed on April 23, 2002. (Id. at 221-22.) She told Dr. Meghjee that she had recently lost her job because of her depression. (Id. at 208.) He told her to decrease her calorie intake and referred her to another doctor for evaluation of her sleep apnea. (Id.) At a follow-up visit on July 22, Plaintiff reported that she had lost one pound. (Id. at 308.) She had been on a strict diet since the last visit, but had yet to start an exercise program. (Id.) She had no chest pain or shortness of breath and was "feeling pretty good." (Id.)

Ahmareen Khan, D.O., performed a sleep study on Plaintiff on August 10.  (Id. at 253-56, 393-96.)  The total study time was 423.5 minutes, during which she slept for 288.5 minutes.  (Id. at 253.)  Of the time spent sleeping, only 18.5 minutes were in REM (rapid eye movements) sleep.  (Id.)  She had total arousals of 41, with most being caused by snoring.  (Id.)  She had almost continuous snoring.  (Id.)  Plaintiff did not meet the criteria of sleep apnea; however, her REM-associated hypopneas, shallow breathing, was worse.  (Id. at 254.)  Dr. Khan recommended a serious weight loss program for Plaintiff and a revaluation when she was within 10% of her recommended body mass index ("BMI").  (Id.)  She then weighed 298 pounds; the maximum weight for a normal BMI for someone five feet seven inches tall is 159 pounds.[3]  (Id.)  Dr. Khan discussed the importance of weight loss with Plaintiff during an office visit ten days later to discuss the results of the sleep study.  (Id. at 402.)  Plaintiff then weighed 313 pounds.  (Id.)  Dr. Khan asked her to adjust her diet and exercise to decrease at least 20% of her weight.  (Id.)  He scheduled her for a return visit after the CPAP titration analysis.  (Id.)

Dr. Khan performed received the report of that analysis nine days later and determined what amount of water pressure should be present in the CPAP machine.  (Id. at 397-99.)  He discussed the use of the CPAP machine with Plaintiff on September 10, again emphasizing the need for weight loss.  (Id. at 401.)  Plaintiff had lost five pounds since her last visit.  (Id.)  Dr. Kahn concluded that Plaintiff's sleep pattern was more consistent with

---

[3]See Body Mass Index Table, www.cdc.gov/nccdphp/dnpa/bmi/calc-bmi.htm; BMI-Body Mass Index; BMI Calculator, www.nhlbi.nih.gov/guidelines/obesity/bmi_tbl.htm.

upper airway resistance syndrome than with sleep apnea.  (<u>Id.</u> at 397.)  The next month, on October 15, Dr. Khan examined Plaintiff and described her as being "extremely non-compliant regarding her diet, her diabetic control and her CPAP."  (<u>Id.</u> at 400.)  She denied any shortness of breath or chest pain, but did complain of depression and stress that prevented her compliance with her medications, diet, and CPAP.  (<u>Id.</u>)

While awaiting the CPAP titration report, Plaintiff returned on September 5 to Dr. Meghjee and reported feeling very depressed.  (<u>Id.</u> at 306.)  She was eating and crying all the time.  (<u>Id.</u>)  She did not have any chest pain, but did have muscle aches and joint pain that prevented her from exercising.  (<u>Id.</u>)  Her abdominal pain had resolved.  (<u>Id.</u>)  The next month, Plaintiff had lost three pounds.  (<u>Id.</u> at 303.)  She had been trying hard to stay on her diet, but had not yet started exercising.  (<u>Id.</u>)  She had been started on a CPAP machine two weeks before and was not feeling as tired.  (<u>Id.</u>)  She was not sure if the machine was working; the batteries might need to be changed.  (<u>Id.</u>)  She weighed 309 pounds.  (<u>Id.</u> at 304.)  Plaintiff had gained two pounds at the next visit, on November 14.  (<u>Id.</u> at 300.)  She had not been following a diet and had not been exercising.  (<u>Id.</u>)  She had an appointment to see a rheumatologist about her generalized achiness and was to see her psychiatrist the next week.  (<u>Id.</u>)  Dr. Meghjee opined that her generalized pain might be fibromyalgia.  (<u>Id.</u>)  Plaintiff had gained five pounds by her next monthly visit.  (<u>Id.</u> at 299.)  She wanted a referral for gastric bypass surgery.  (<u>Id.</u> at 298.)  Dr. Meghjee wanted to refer her to a doctor at Washington University.  (<u>Id.</u>)  Plaintiff, a resident of St. Charles, did not want to go that far away.  (<u>Id.</u>)  Her depression was "markedly improved."  (<u>Id.</u>)

Plaintiff did consult a rheumatologist, Rama Bandlamudi, M.D., on November 18, 2002. (Id. at 456-59.) She complained of being stiff all over and of having pain in her arms and hips radiating to her back. (Id. at 457.) She had 5/5 strength in all four extremities and negative straight leg raising. (Id. at 456.) His initial impression was of arthralgia and myalgia. (Id.) She reported no improvement the next month. (Id. at 454.) Finding no evidence of inflammatory arthritis, Dr. Bandlamudi diagnosed her with fibromyalgia syndrome and degenerative joint disease of T-spine and L-spine, prescribed Ultracet, and encouraged her to lose weight and do range of motion and muscle strengthening exercises. (Id. at 453, 455.) Plaintiff was to follow up in three or four months; however, she did not keep that appointment. (Id. at 450, 453.)

Plaintiff next saw Dr. Meghjee in February 2003. (Id. at 297.) She was still not following a diet. (Id.) Two weeks later, she was following a diet. (Id. at 295.) She was reportedly doing okay. (Id.) On March 5, Plaintiff weighed 315 pounds and was instructed to diet and exercise 30 minutes each day. (Id. at 292.) She was experiencing symptoms of hypoglycemia and would become very shaky if her blood glucose levels dropped below 100. (Id.) At her April 21 visit to Dr. Meghjee, Plaintiff reported that she had not been dieting or exercising since the last visit. (Id. at 289.) Her son had been hurt and she was angry all the time. (Id.) She had signed up for "stress classes" at a crisis center and was encouraged to attend. (Id.) She had also signed up the previous week for Overeaters Anonymous. (Id.) Her depression was described as being not well controlled, as was her diabetes. (Id.) At her

next visit, in June, Plaintiff reported that she was not doing any better.  (<u>Id.</u> at 287.)  She wanted a referral for surgery for her obesity.  (<u>Id.</u>)

The next month, Plaintiff informed Dr. Meghjee that she had decided to go on the Atkins' diet.  (<u>Id.</u> at 412.)  Her weight had increased, and she had not been following a diet or exercising.  (<u>Id.</u>)  She was encouraged to diet and was told that her medications would be adjusted once she started to lose weight.  (<u>Id.</u>)  In August, Plaintiff complained to Dr. Meghjee of a headache of three to four days' duration.  (<u>Id.</u> at 422.)  Additionally, her vision was blurred and her neck was stiff.  (<u>Id.</u>)  A CT scan without contrast was normal.  (<u>Id.</u> at 421.)  She was prescribed Vicodin for her headaches and advised not to drive when taking it.  (<u>Id.</u> at 422.)

Two weeks later, on August 26, Plaintiff went to the emergency room at SJHC with complaints of chest pain and shortness of breath that were worse when she laid down.  (<u>Id.</u> at 432, 434.)  She refused to be admitted and left against medical advice four hours later.  (<u>Id.</u> at 430, 433, 435.)  Her pain level on discharge was zero out of ten.  (<u>Id.</u> at 435.)  The next day she consulted  Dr. Meghjee.  (<u>Id.</u> at 410.)  She was under a lot of stress due to the recent death of her nephew and uncle.  (<u>Id.</u>)  She was not using the CPAP machine.  (<u>Id.</u>)  The next day, August 28, her shortness of breath was much better, however, she had a sinus headache.  (<u>Id.</u> at 409.)  On September 2, Plaintiff reported feeling better.  (<u>Id.</u> at 408.)  She had no chest pain, dizziness, or coughing.  (<u>Id.</u>)  Her CMF, which had been a matter of concern on August 27, was described as resolving.  (<u>Id.</u> at 408, 410.)  On September 18, her CMF had resolved.  (<u>Id.</u> at 407.)  She was reportedly doing much better.  (<u>Id.</u>)

A psychiatrist, Sei Young Choi, M.D., diagnosed Plaintiff on April 19, 2001, with acute major depression. (Id. at 210.) He assessed her current and previous year's Global Assessment of Functioning ("GAF") as 65.[4] (Id.) Asked in June 2002 to assess Plaintiff's current mental status in the areas of appearance and behavior; thought process and content; perceptual abnormalities; affect; and cognitive functioning, the only variation he noted from being normal or good in each area was that she had a sad affect. (Id. at 212.) He assessed her has having no limitations in her daily activities, ability to maintain social functioning, and her ability to concentrate, persist, or pace herself, nor did she experience repeated episodes of deterioration in a work-like setting. (Id.) His treatment plan for her was one 40-milligram tablet of Celexa at bedtime. (Id.) As noted by Plaintiff in her testimony, Dr. Choi retired the following month. (Id. at 215.)

Also before the ALJ was a June 2003 written report by Cengiz Sumer, M.D., who had first seen Plaintiff in November 2002 for chronic mental and emotional problems. (Id. at 283-84.) Dr. Sumer had concluded in this report that Plaintiff was sad, depressed, and "unable to organize her thoughts in order to finish any task." (Id. at 283.) "It appears that

---

[4]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Manual at 34.

her ability to think and concentrate are greatly diminished and she is unable to follow any medical suggestions such as diet and exercise." (Id.) Her diagnosis was major depressive disorder and somatization disorder. (Id.) She was then being treated with Lexapro, Ativan, and Topomax. (Id. at 284.)

Pursuant to her DIB and SSI applications, a psychologist, James W. Lane, Ph.D., completed a Psychiatric Review Technique form in July 2002, to assess the affect of Plaintiff's acute depression on her ability to function. (Id. at 260-74.) He concluded that her depression created only a mild limitation in her ability to function in the areas of (1) activities of daily living; (2) maintaining social functioning; and (3) maintaining concentration, persistence, or pace. (Id. at 270.) It resulted in no episodes of decompensation of extended duration. (Id.) Dr. Lane based his conclusions on Plaintiff's medical records to date and the treatment notes of Dr. Choi. (Id. at 272-74.)

One month later, Plaintiff's physical residual functional capacity was assessed. (Id. at 275-82.) It was concluded that she had the capacity to occasionally lift 50 pounds, frequently lift 25 pounds, and stand, sit, or walk about six hours in an eight-hour work day. (Id. at 276.) Her ability to push or pull was unlimited. (Id.) She had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 277-79.) The evaluator found Plaintiff to be only partially credible. (Id. at 280.)

### The ALJ's Decision

The ALJ first noted that, in her applications and testimony, Plaintiff was alleging disability caused by arthritis, heart problems, diabetes, sleep apnea, headaches, major

depression, and anxiety attacks. (Id. at 13.) He found that the evidence supported the presence of several severe impairments that more than minimally limited her ability to do basic work activities: insulin-dependent diabetes mellitus; morbid obesity; upper airway resistance syndrome; fibromyalgia; and congestive heart failure. (Id. at 14.) Other medical impairments were not so severe, e.g, her arthritis of joints other than those in her spine, degenerative joint disease of the thoracic spine, and headaches. (Id.) The first was not supported by any medically acceptable diagnostic techniques; the second was not severe, as evidenced by Dr. Bandlamudi's findings and the conservative treatment; and the third was controlled by medication. (Id.)

The ALJ further found that Plaintiff did not have a severe mental impairment. (Id.) He specifically found her assertions of crying spells, confusion, a general lack of interest, problems concentrating, nervousness around others, and inability to tolerate stress were "unpersuasive in light of the record as a whole." (Id.) He noted that Dr. Choi had diagnosed acute major depression and that "acute" was "defined as relatively severe but of short course." (Id. at 14-15.) He also noted that a mental status evaluation performed by Dr. Choi demonstrated no deficits or abnormalities other than a sad affect, that Plaintiff had no significant functional limitations, and that he had assessed Plaintiff's GAF as 65. (Id. at 15.) The ALJ further concluded that Dr. Meghjee's treatment notes did not support Plaintiff's claim of continuing, disabling depression. (Id.) Dr. Sumer's June 2003 statement was discounted because he did not provide any treatment notes to support his opinion and the

opinion was "apparently based on a single examination – the doctor stated, 'Psychiatric *examination* revealed that patient is . . .'" (Id.) (Alteration in original.)

Addressing the question of Plaintiff's residual functional capacity, the ALJ evaluated her credibility pursuant to the factors in Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984). He first found that the medical evidence did not support her complaints of ulcerations on her legs and feet or of disabling edema. (Id. at 16.) And, the medical evidence also showed that when Plaintiff was compliant with a diet her blood sugar levels improved and when she used the CPAP machine her fatigue improved. (Id.) Her fatigue could also be improved through weight loss. (Id.) The only evidence of congestive heart failure was in August 2003 and was resolved, with treatment, in a month. (Id.) A chest x-ray and stress test were normal. (Id.) There were no complaints of joint stiffness or pain or of muscle aches after Dr. Bandlamudi prescribed medication for Plaintiff's fibromyalgia. (Id. at 17.)

Additionally, Plaintiff's daily activities, e.g., helping children with homework, visiting her mother daily, and doing chores and shopping, with her niece's occasional help, did not support her credibility. (Id.) Plaintiff had worked for years with her diabetes, and there was no objective evidence that it had deteriorated. (Id.) Plaintiff had undergone only conservative treatment. (Id.) And, the primary aggravating factor was her non-compliance with treatment, indicating "self-infliction of symptoms." (Id.) The ALJ also noted that Plaintiff had applied twice before for disability benefits, once in 1990 and once in 1997, yet had substantial earnings thereafter. (Id.)

After finding the foregoing, the ALJ determined that Plaintiff had the residual functional capacity to lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently, and to stand, sit, or walk a total of 6 hours in an 8-hour workday. (Id.) Consequently, she retained the residual functional capacity to perform a full range of light work, including her past relevant work as a mortgage clerk, payroll clerk, data entry clerk, and circuit board assembler. (Id. at 17-18.) She was not disabled within the meaning of the Act.

**Additional Medical Records Before the Appeals Council**

The ALJ entered his adverse decision in December 2003. Plaintiff subsequently submitted the medical records of Cengiz Sumer, M.D. (Id. at 7.) The Appeals Council ordered this evidence to be included in the record. (Id.)

After Dr. Choi retired, Plaintiff began seeing Dr. Sumer on November 20, 2002. (Id. at 488.) Dr. Sumer reported that Plaintiff cried easily, was unable to enjoy life, was withdrawn, and had poor relationships with her family.[5] (Id. at 489.) She slept an average of three to six hours a night. (Id.) Dr. Sumer diagnosed her with major depression, recurrent, and somatization disorder and prescribed Prozac and Ativan. (Id.) This prescription was renewed in January 2003. (Id. at 490.) In February, Plaintiff reported that she had started going to an overeaters' group. (Id.) Dr. Sumer additionally prescribed Wellbutrin to help her control her appetite. (Id.) At a monthly visit in June, Plaintiff

[5]Many of Dr. Sumer's notes are illegible.

reported that she was depressed every day, unable to control her emotions, became easily upset, got angry quickly, felt worthless, and was unable to set goals. (Id. at 492.) Additionally, she was sleeping poorly. (Id.) She was prescribed Ativan, Lexapro, and Topomax. (Id.) At the July visit, however, she was still not feeling well. (Id. at 493.) Her children were at camp and she was worried about them. (Id.) She had not gained any weight; her appetite was less. (Id.) In August, Plaintiff informed Dr. Sumer that her nephew had been hospitalized ten days before and was in a diabetic coma. (Id. at 494.) Her sleep and appetite were poor. (Id.) She next consulted Dr. Sumer in October. (Id. at 495.) She was then sad because of her financial problems. (Id.) Her prescriptions were renewed. (Id.) Plaintiff's sleep was reportedly okay in November. (Id. at 496.) In January 2004, Plaintiff reported that she was concerned about her health and was trying to lose weight. (Id. at 497.)

At the request of Plaintiff's counsel, Dr. Sumer answered a questionnaire about Plaintiff's mental status during the period from February 2002 to December 2003. (Id. at 487.) Dr. Sumer reported that Plaintiff was unable to deal with the public, could not interact with supervisors, was physically unable to deal with work stresses, could not do any physical work, could not maintain concentration or her appearance, could not remember or carry out simple detailed instructions, and was unable to perform job tasks due to her emotional, mental, and physical problems. (Id.)

As noted above, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.

## **Legal Standards**

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 416.920, 404.1520. See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the "special technique" set forth in 20 C.F.R. § 416.920a. 20 C.F.R. § 416.920a(a). This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. Id. § 416.920a(b)(1). The degree of functional limitation resulting from this impairment must then be rated. Id. §§ 416.920a(b)(2) and (c). This rating follows a specific format, identifying four broad functional and analyzing the degree of limitation in each area imposed by the mental impairment. Id. §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." Id. § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." Id. A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. Id. § 416.920a(d)(1). On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations

in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder." Id. § 416.920a(d)(2). If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3). Section 416.920a(e) requires that the application of this technique be documented. An ALJ is to document the application in his or her decision. Id.

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the

duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  And, although a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).  The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed." **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258

F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

After a claimant's RFC is determined, the ALJ must compare that RFC to the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1560(b), 416.960(b). "Past relevant work is that which [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1) (alterations added). If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. §§ 416.920(f), 404.1520(f).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at 1206-07. When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not

reverse that decision merely because substantial evidence would also support an opposite conclusion. **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

### Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole. The Commissioner disagrees.

For the reasons set forth below, the Court finds that a remand is necessary to (a) reevalute Plaintiff's credibility in light of Dr. Sumer's treatment notes; (b) reevaluate the severity of her depression in light of those notes; and (c) secure, if then found to be necessary, a consultative examination.

The ALJ discounted Dr. Sumer's opinion as to the severity of Plaintiff's depression based on the mistaken assumption that the opinion was reached after only one examination.[6] The Commissioner argues that this was not error because Dr. Sumer's treatment notes are inconsistent with Dr. Choi's opinion and with the conclusions of Dr. Lane, a non-treating,

---

[6]The ALJ did not have before him Dr. Sumer's treatment notes. Those notes submitted to the Appeals Council and included by the Council in the record. "Once it is clear that the Appeals Council has considered newly submitted evidence, . . .[the Court's] role is limited to deciding whether the [ALJ's] determination is supported by substantial evidence on the record as a whole, *including* the new evidence submitted after the determination was made." **Riley v. Shalala**, 18 F.3d 619, 622 (8th Cir. 1994) (alterations and emphasis added).

non-examining consultant.

"'The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alterations in original). Accord **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). The longer a claimant's physician has treated her and the more times, the more weight is given to that physician's opinion. 20 C.F.R. § 404.1527(d)(2)(i). And, the more knowledge a physician has about the claimant's impairments, the more weight is given to that physician's medical opinion. 20 C.F.R. § 404.1527(d)(2)(ii). "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. § 404.1527(d)(4) (alterations added). More weight is generally given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

The record includes treatment notes from Dr. Choi for two visits, one in April 2001 and one in June 2002 – fourteen months apart.[7] On the other hand, the treatment notes of Dr. Sumer are of ten visits during a fourteen month period, and the longest period between visits

---

[7]Dr. Choi refers in a form he completed to Plaintiff's last office visit being on July 19, 2002. There are no treatment notes for such visit.

is three months. Dr. Lane never saw Plaintiff. The ALJ erred in discounting Dr. Sumer's opinion based on an erroneous assumption that Dr. Sumer saw Plaintiff only once.

This error adversely affected the ALJ's evaluation of Plaintiff's credibility. The ALJ discredited Plaintiff's credibility due, in part, to her non-compliance with diet and exercise programs. Dr. Sumer, however, attributed this non-compliance to her depression.

Additionally, the Court notes that the ALJ's duty to develop the record duty requires that the ALJ recontact medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim." **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004). See also **Haley v. Massanari**, 258 F.3d 742, 749 (8th Cir. 2001) (holding that ALJ's duty to develop the record includes ordering a consultative examination when such an examination is necessary for the ALJ to make an informed decision). On remand, if the ALJ can not make an informed decision about the severity of Plaintiff's depression, after considering Dr. Sumer's notes as well as Dr. Choi's, a consultative examination should be ordered.

## Conclusion

For the foregoing reasons, the Court finds that this case must be remanded to the Appeals Council for remand to the ALJ for further consideration of Plaintiff's mental impairments, a reassessment of Plaintiff's credibility, and, if necessary, a consultative examination. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings consistent with this Memorandum and

Order.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of January, 2006.